# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| URSULA B. KNIGHT, | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 12-00463-KD-C** |
| | ) | |
| FOURTEEN D ENTERPRISES, INC.,[1] | ) | |
|     **Defendant.** | ) | |

## ORDER

This action is before the Court on the Motion for Summary Judgment (Doc. 36) and supporting documents (Docs. 37-38) filed by Defendant Fourteen D Enterprises, Inc. ("FDE") pursuant to Federal Rule of Civil Procedure 56, along with the Response in opposition (Doc. 44) and supporting documents (Docs. 45-47) filed by Plaintiff Ursula B. Knight ("Knight"), and FDE's Reply (Doc. 48) to said Response.[2] The motion has been taken under submission and is ripe for adjudication. (<u>See</u> Docs. 39, 43). Upon consideration, and for the reasons stated herein, the Court finds that the motion for summary judgment is due to be **GRANTED**.

### I.    Procedural History

On July 18, 2012, Knight initiated this action by filing a Complaint (Doc. 1) with the Court, asserting the following claims against FDE :

- Count I - discrimination on the basis of Knight's race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., as amended by the

---

[1] The Defendant was identified in the Complaint (Doc. 1) as "Descher Organization d/b/a McDonald's." In its Answer and LR 3.4 Disclosure Statement, the Defendant identified itself as "Fourteen D Enterprises, Inc., incorrectly designated in the Complaint as 'Descher Organization, d/b/a McDonalds . . . ' " (Doc. 10 at 1 (footnote omitted); Doc. 11). The Defendant has continued to identify itself as Fourteen D Enterprises, Inc. in all of its subsequent filings in this action, including the present motion (Doc. 36). Plaintiff admits that Fourteen D Enterprises, Inc. was her employer at the relevant times in this action (Plaintiff's Response to Defendant's Statement of Undisputed Facts, Doc. 47 at 1), and she has never objected to the Defendant being identified as such. Accordingly, it is **ORDERED** that the entity Fourteen D Enterprises, Inc. is substituted as the Defendant in this action.

[2] FDE has also filed objections to Knight's evidentiary submissions (Doc. 49), to which various responses and replies have been filed by both parties (Docs. 50-53).

Civil Rights Act of 1991, 42 U.S.C. § 1981a ("Title VII"), and 42 U.S.C. § 1981 ("§ 1981").

- Count II - retaliation in violation of Title VII and § 1981.

- Count III – discrimination on the basis of Knight's age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA").[3]

In her Complaint, Knight "contends that profanity is use [sic] on a regular basis at that McDonalds' [sic] location and none of the younger white Crew Members engaging [sic] such activity were ever fired or even disciplined for the use of profanity" and "contends that her termination was due to her race, age and in retaliation for raising complaints about the treatment of herself and other employees."  (Doc. 1 at 3, ¶¶ 10-11).  On December 24, 2012, FDE filed its

---

[3]     As all of Knight's claims are asserted pursuant to federal statutes, the Court has original jurisdiction over this entire action pursuant to 28 U.S.C. § 1331.

Ordinarily, a plaintiff must carry out certain administrative prerequisites before a claim under Title VII or ADEA can be asserted in federal district court.  See, e.g., Newman v. Career Consultants, Inc., 470 F. Supp. 2d 1333, 1342 (M.D. Ala. 2007) ("An employee seeking to bring suit against her employer under either Title VII or the ADEA must first file an administrative charge of discrimination with the EEOC. Ledbetter v. Goodyear Tire & Rubber Co., 421 F.3d 1169, 1178 (11th Cir. 2005) (Title VII); Jones v. Dillard's, Inc., 331 F.3d 1259, 1263 (11th Cir. 2003) (ADEA)."); Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001) ("Before a potential plaintiff may sue for discrimination under Title VII, she must first exhaust her administrative remedies.").  Knight's Complaint makes no allegation that she has carried out these administrative prerequisites.  However, the failure to satisfy such prerequisites does not deprive the Court of subject-matter jurisdiction; rather, they are conditions precedent that are subject to waiver.  See, e.g., Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982) ("We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."); McClinton v. Alabama By-Products Corp., 743 F.2d 1483, 1485 (11th Cir. 1984) (holding that ADEA "notification requirement is not a jurisdictional prerequisite that deprives a court of subject matter jurisdiction, but a requirement more in the nature of a statute of limitations that is subject to equitable tolling").

FDE raises no challenge based on a failure to satisfy such conditions precedent in its present motion; therefore, the issue has been waived.  Moreover, "[u]nlike Title VII[ and] the ADEA, . . . § 1981 does not require that a plaintiff exhaust administrative remedies before bringing suit in federal court. See Caldwell v. Nat'l Brewing Co., 443 F.2d 1044, 1046 (5th Cir. 1971) (holding that a plaintiff alleging discriminatory employment practices with regard to race 'has an independent remedy under § 1981 without respect to exhaustion under Title VII')." Newman, 470 F. Supp. 2d at 1343-44.

Answer denying any liability for Knight's claims.  (Doc. 10).  FDE timely filed the present motion, which requests summary judgment in favor of FDE on all of Knight's claims.  (Doc. 36).

## II.     Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56(c) governs procedures and provides as follows:

(1) ***Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
    (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
    (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) ***Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) ***Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.

(4) ***Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). As the Eleventh Circuit has articulated, however,

3

The nature of this responsibility varies . . . depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial.

. . . <u>Celotex</u> requires that for issues on which the movant would bear the burden of proof at trial,

> that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come [s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

[<u>United States v. ]Four Parcels[ of Real Property</u>], 941 F.2d [1428, ]1438[ (11th Cir. 1991)] (citations and internal quotation marks omitted; emphasis in original).

For issues, however, on which the non-movant would bear the burden of proof at trial,

> the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show [ ]-that is, point[ ] out to the district court-that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

<u>Four Parcels</u>, 941 F.2d at 1437-38 (citations, footnote, and internal quotation marks omitted; emphasis in original).

If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made. <u>Coats & Clark</u>, 929 F.2d at 608. If, however, the movant carries the initial summary judgment burden in one of the ways discussed above, responsibility then devolves upon the non-movant to show the existence of a genuine issue as to the material fact.

For issues on which the movant would bear the burden of proof at trial, the non-movant, in order to avoid summary judgment, must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact. Only if after introduction of the non-movant's evidence, the combined body of evidence presented by the two parties relevant to the material fact is still such that the movant would be entitled to a directed verdict at trial-that is,

such that no reasonable jury could find for the non-movant-should the movant be permitted to prevail without a full trial on the issues. Anderson[ v. Liberty Lobby, Inc.], 477 U.S. [242,] 249-50, 106 S. Ct. [2505,] 2511[ (1986)].

For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. Celotex, 477 U.S. at 332, 106 S. Ct. at 2557 (Brennan, J., dissenting). Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. See Melissa L. Nelkin, One Step Forward, Two Steps Back: Summary Judgment After Celotex, 40 Hastings L.J. 53, 82-83 (1988).

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (headings and footnotes omitted).

The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807 (11th Cir. 2010) (en banc) (citation omitted).

If a non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. In reviewing whether a non-moving party has met its burden, the Court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are

to be drawn in its favor.  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted).

### III.    Facts[4]

On August 30, 2010, Knight, who is black, was hired by FDE to work as a crew member at its McDonald's restaurant in Citronelle, Alabama.  (Cauley Decl., Doc. 38-1 at 3, ¶ 2).  As a crew member, Knight's duties included greeting customers, waiting on customers, taking orders, filling orders, cleaning the lobby, and cleaning the bathroom.  (Knight Depo., Doc. 38-2 at 13, p. 48).

The "chain of command" at the Citronelle McDonald's is as follows: crew members report to a shift manager (also known as a "swing manager"), shift managers report to an assistant manager, the assistant managers report to the store manager, and the store manager reports to the area supervisor.  (Doc. 38-2 at 14, pp. 49-50).  Deanna Cauley ("Cauley") was the store manager throughout Knight's employment at the Citronelle McDonald's.  (Cauley Depo., Doc. 38-3 at 4, pp. 7-8; Doc. 38-1 at 3, ¶ 4).  All store disciplinary notices are to be provided to Cauley for her review shortly after being issued.  (Doc. 38-3 at 14, p. 46; Doc. 38-1 at 3, ¶ 5).

Knight was terminated following an incident at the McDonald's on February 8, 2012.  In her

---

[4]    The Court has made its determination of facts by "review[ing] the record, and all its inferences, in the light most favorable to [Knight,] the nonmoving party."  E.g., Benson v. Tocco, Inc., 113 F.3d 1203, 1207 (11th Cir. 1997).  Moreover, the parties are reminded that, on summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3). See also, e.g., Sharpe v. Global Sec. Int'l, 766 F. Supp. 2d 1272, 1282 (S.D. Ala. 2011) (Steele, C.J.) ("[T]he Court . . . will not independently examine uncited portions of the record in search of support for a particular proposition[ on summary judgment]." (citing cases)).

The Court notes that FDE's deposition evidence does not comply with SD ALA LR 5.5(c), which states: "If discovery materials are germane to any motion or response, only the **relevant portions** of the material shall be filed with the motion or response."  (emphasis added).  Rather than limiting its evidentiary submissions only to cited testimony, FDE has instead chosen to submit, and thus make the Court sift through, several entire and lengthy deposition transcripts.  Counsel for FDE is requested to take note of this rule and limit its evidentiary submissions accordingly in future cases.

Both parties have submitted unsworn declarations executed pursuant to, and in substantial compliance with, 28 U.S.C. § 1746.  Accordingly, the Court will consider those declarations as evidence on summary judgment.

deposition (Doc. 38-2), Knight describes that incident as follows:

Harrington, a shift supervisor, told Knight, "Ms. Ursula, I need you to stock sauces before you get off." Knight then went back and asked her manager, "What sauces?" Harrington "kept going on again: I need you to stock sauces[,]" and again Knight said, "What sauces?" Harrington then "went like car windshield wipers and . . . expressed to [Knight]: You ain't going to do what I asked you to do? So she flipped [Knight] so bad with [her] anger, and [Knight] just told her: Hell no." Knight did not raise her voice when she said "hell no," simply saying it in a "normal tone." All of this was done in front of customers. After Knight said "hell no," Harrington told her, "[W]ell, I'm going to write you up[,]" to which Knight responded, "Well, management, you have to do what you have to do." Harrington then went into the office to speak to Sonya Hancock. (Doc. 38-2 at 21, pp. 79-80).

Knight followed Harrington into the office and spoke to Hancock about the incident. At some point while in the office, Knight said, "Hell, I'm sick of this." Susan DeSalvo came in, told Knight that she was not going to be written up, and asked her to go ahead and stock sauces. Knight went to the back of the restaurant for the sauces and began stocking. Harrington later came back and said, "Well, I'm going to write you up[,]" to which Knight responded, "[W]ell, do what you have to do." (Doc. 38-2 at 22, pp. 81-84).

Written statements provided by other McDonald's employees - Harrington, Sonya Hancock, Susan DeSalvo, Nina Schambeau, Dustin Johnson, and Laterrica Blakney - regarding the February 8, 2012 incident (Doc. 38-1 at 43-53) confirm that Knight refused Harrington's directive that she stock sauces and that she used some "profanity" or "cursing" during the incident. The statements

also indicate that Knight raised her voice at times and would slam boxes as she proceeded to stock sauces. Knight denies that she used any profanity, other than "hell" twice; that she ever raised her voice or made a scene; or that she slammed boxes. (Doc. 38-2 at 25, pp. 95-6).

Cauley "was not present during the February 8, 2012 incident." (Doc. 38-1 at 7, ¶ 20). However, the following day, February 9, she reviewed the disciplinary notice against Knight arising from the incident, along with the written statements of the employees who witnessed the incident. (Doc. 38-1 at 7-8, ¶ 20). In addition, prior to Knight's termination, Cauley was orally informed by DeSalvo that Knight used the work "fuck" when confronting managers during the incident. (Doc. 38-1 at 9, ¶ 26). That same day Cauley "met with [Knight] regarding the events of the previous day" and claims that Knight "admitted to the conduct reported by Ms. Harrington and the other employees." (Doc. 38-1 at 9, ¶ 27). Cauley informed Knight during that meeting that her employment was terminated. (Doc. 38-1 at 9, ¶ 27).

Cauley made the decision to terminate Knight's employment on February 9, 2012. The operations manager responsible for the Citronelle McDonald's approved the decision. (Doc. 38-1 at 9-10, ¶¶ 27, 29; Doc. 38-6 at 2, Wilson Decl. ¶ 3). Cauley attests that Knight's "employment was terminated for insubordination, using profanity toward a manager, and being disruptive on February 8, 2012. In making the decision to terminate [Knight]'s employment, [Cauley] also considered [Knight]'s prior disciplinary record." (Doc. 38-1 at 9, ¶ 28. See also Doc. 38-3 at 24, Cauley Depo. pp. 86-87). Specifically, at the time of her termination, Knight's FDE personnel file contained written disciplinary notices relating the following incidents:

- November 12, 2010 – Reprimand/Discipline for "Poor Customer Relations" (e-signed by "Owner Operator") – "Words were exchanged between Mrs Knight and June and the customers could hear when Sonya the manager heard [sic] the 2 she

went to see what was wrong at that point Mrs Knight started raising her voice at Sonya which ask her to calm down she kept being loud and Sonya told her since she wouldn't calm down she needed to go home and cool off she told her she wouldn't go home and that she was calling Gregg Descher I then had to get involved to resolve the matter" (Doc. 38-1 at 3-4, 13-14, ¶ 6 & Ex. 2)

• November 24, 2010 – Reprimand/Discipline for "Register Shortage/Violation" (Cauley describes this disciplinary notice as being for a "register shortage") (e-signed by supervisor "Susan Desalvo," no other signatures) – "Her [sic] was 3.56" (Doc. 38-1 at 4, 15-16, ¶ 7 & Ex. 3)

• March 11, 2011 – Reprimand/Discipline for "Abusive Language/Arguing/Fighting" (e-signed by supervisor Sonya Hancock, no other signatures) – "Called another crew member a raciest [sic] demon in front of a customer" (Doc. 38-1 at 4, 17-18, ¶ 8 & Ex. 4)

• March 17, 2011 (First) – Reprimand/Discipline for "Interference with Employees," "Poor Customer Relations," and "Other" (e-signed by supervisor "Sonya Hancock," no other signatures) – "Has been telling customers we are nasty[;] told a customer we make her sell cold fries[;] told a customer we don't make the kids do any cleaning and make her do it all and she has a baby at home an [sic] don't need to be doing all this work[;] the point is she is complaing [sic] to the customers about things they shouldn't even know about then they are calling it to my attention" (Doc. 38-1 at 4,  19-20, ¶ 9 & Ex. 5)

• March 17, 2011 (Second) – Reprimand/Discipline for "Poor Customer Relations" and "Abusive Language/Arguing/Fighting" (physically signed by manager "Kaylynn

Sullivan," no other signatures) – "Ursula and I were both working front counter . . . she had taken the last order an [sic] there was nobody else in lobby . . . I proceeded to help drive thru which was in the danger zone . . . When a customer walked into the lobby Ursula was standing away from the counter with her arms folded . . . I was completing an order so when I brought the customer to Ursual's [sic] attention she very rudely told me she had to take an order and was waiting on something . . . I told Ursula that I policy [sic] was take two fill two she began to get loud and by this time had walked <u>& they were shocked at her behavior . . . When I got back on counter and took the ladies order she just wanted an ice cream cone . . . This makes several times that Mrs. Knight has disrespect [sic] me in front of customer</u>"[5] (Doc. 38-1 at 4, 21-22, ¶ 10 & Ex. 6)

- June 20, 2011 – Reprimand/Discipline for "Poor Performance" (e-signed by supervisor Sonya Hancock, no other signatures) – "She took a mans [sic] order on counter then clocked out and left she did not serve his order nor did she tell anyone the order had been taken" (Doc. 38-1 at 5, 23-24, ¶ 11 & Ex. 7)

- July 28, 2011 – Reprimand/Discipline for "Poor Performance," "Abusive Language/Arguing/Fighting," and "Insubordination" (e-signed by supervisor Ashlei Buckley, no other signatures) – "She handed the bag of food out to the wrong customer and preceded to tell me that I did not bag that order and preceded to tell the crew and customers that I made the mistake and conitued [sic] to say that it was not her fault but mine she said to a fellow crew member that we better leave her alone she knew what she was doing that we didn't know how to do it. She already disrespected a manager on shift earlier this morning. I told her to go home and she

---

[5] The underlined portion of this explanation was handwritten on the original exhibit (Doc. 38-1 at 22).

went and told the other manager on shift that we needed her here and she didnt [sic] want" (Doc. 38-1 at 5, 25-26, ¶ 12 & Ex. 8.)

- August 1, 2011 – Reprimand/Discipline for "Poor Performance," "Interference with Employees," and "Poor Customer Relations" (e-signed by supervisor Ruth Hritz) – no explanation provided (Doc. 38-1 at 5, 27-28, ¶ 13 & Ex. 9)

- August 3, 2011 – Reprimand/Discipline for "Poor Performance," "Interference with Employees," "Poor Customer Relations," and "Uncooperative" (e-signed by supervisor Margo Smith) – "Ursula was asked to clean the lobby and she remarked that I shouldnt [sic] have to clean it make one of the other girls clean it later she was taking an order from a customer and she pulled out her cell phone and proceeded to use it while taking the order she then ran to the bathroom and stayed in there atleast [sic] 10-15 mins talking on her phone standing by the sink myself and another manager witnessed  this also when asked to perform simple duties like sweeping mopping etc she would have some uncooperative response or refuse to do the duty" (Doc. 38-1 at 5, 29-30, ¶ 14 & Ex. 10)

- August 6, 2011 –  Reprimand/Discipline for "Other" (e-signed by supervisor "Owner Operator") – "Laid off from 8/8/11 to 8/14/11 due to improper conversations with customers that are negative against MCD and refusing to leave when asked by MGMT" - Knight was suspended from August 8 – 14, 2011 for this incident (Doc. 38-1 at 5-6, 31-32, ¶ 15 & Ex. 11)

- November 2, 2011 – Reprimand/Discipline for "Register Shortage/Violation" (e-signed by "Owner Operator") – "-3.51" (Doc. 38-1 at 6, 33-34, ¶ 16 & Ex. 12)

- November 11, 2011 – Reprimand/Discipline for "Other" (e-signed by Sonya

Hancock) – "Was asked to clean lobby then she tossed something that was in her hand an [sic] said Im [sic] taking orders have someone else clean lobby" (Doc. 38-1 at 6, 35-36, ¶ 17 & Ex. 13)

- December 31, 2011 - Reprimand/Discipline for "Insubordination" (e-signed by supervisor Gabrielle Harrington) – "Ask Mrs Knight to clean lobby before she got off and she refused to do it" (Doc. 38-1 at 6, 37-38, ¶ 17 & Ex. 14)

- January 12, 2012 – Reprimand/Discipline for "Unexcused Absence" (e-signed by "Owner Operator") – "Ursula was scheduled to work and did not show or call . . . she came in lobby during the time she was scheduled to order food and was asked why she was not at work I told her she was computer generated and not wrote in and she should be at work . . . She showed me a paper where she wrote down Wed instead of Thurs but never attempted to cover the shift once she knew she made a mistake" (Doc. 38-1 at 6, 39-40, ¶ 18 & Ex. 15)

- February 8, 2012 – Reprimand/Discipline for "Abusive Language/ Arguing/Fighting," "Uncooperative," and "Insubordination" (e-signed and physically signed by supervisor Gabrielle Harrington) - "I asked Mrs Knight to stock some of the sauce behind front counter before she got off then she replyed [sic] screaming at me that she was not going to do the stocking because she had done lobby so I said so your [sic] not goin [sic] to do what I ask you to do she said no I aint say that but I aint stockin [sic] Nina the CRR watched everything that happened we walk into the office to talk to a salary MRG abou [sic] that just happened then she starts hollering and cursein [sic] then got all in my face the salary MRG were Sonya and Susan. While this took place on the floor Ms. [illegible] also step up front from grill and

seen how she was acting and screaming at me.  She then went back to grill without steping [sic] in, then while in office talking with the salary mng. About this I told Mrs. Knight I was still going to write her up for the way she had acted.  Ms. Susan then told me to not write her up because she was going to stock!  Mrs. Knight left out office to go stock and I went back to the floor to run for drive thru.  She then came up with stock and got in my face again an [sic] hollering sayin [sic] she needed Robert number [sic] or whoever was over Ms. Deanna I told her Robert was not over her anymore and I didn't [illegible] anybody's number.  After Mrs. Knight had left Laterrica Blankey came and told me Mrs Knight told her to stick with her culture and to not go against her culture.  Also while she was stocking sauce she was slaming [sic] the boxes of sauce down on the table."[6]  (Doc. 38-1 at 6-7, 41-43, ¶ 19 & Ex. 16)

IV.    **Analysis**

   a.    **Evidentiary Issues**

Contemporaneously with its Reply, FDE filed objections to the declarations of April Stewart and Ursula Knight (Doc. 49), to which the parties have submitted various responses and replies (Docs. 50-51, 52-1,[7] 53).

Initially, FDE objects to Knight's evidentiary submissions as untimely.  Knight's response to the motion for summary judgment was due on or before December 24, 2013.  (Doc. 43).  The Court's CM/ECF system indicates that, while her response brief was timely filed (Doc. 44), her

---

[6] The underlined portion of this explanation was handwritten on the original exhibit (Doc. 38-1 at 42-43).

[7] Upon consideration, it is **ORDERED** that FDE's motion for leave to file a reply in further support of its evidentiary objections (Doc. 52) is **GRANTED**.  The Court has considered the arguments and authority raised in the attached reply (Doc. 52-1), as well as Knight's response to same (Doc. 53).

evidentiary submissions (Docs. 45-46) and response to FDE's statement of undisputed facts (Doc. 47) were not filed until the next day, December 25, 2013 (respectively, at approximately 12:08 a.m. CST, 12:56 a.m. CST, and 1:13 a.m. CST). After FDE objected to the untimely filings (Doc. 49 at 1 n.1; see also Doc. 52-1 at 2 n.1), Knight filed a "motion to deem her summary judgment response filings as timely, or permitting the out of time filing of the supportive document." (Doc. 51). In support of this motion, Knight's counsel faults "family activities" associated with the Christmas holiday period, along with technical issues experienced while attempting to file Knight's evidentiary submissions. In addition, Knight's counsel attached to the motion a physically-signed version of Knight's unsworn declaration (Doc. 51-1), which had previously been submitted with an "s/ signature" (Doc. 46). FDE had also previously objected to Knight's electronically signed declaration "because it does not contain a signature of the declarant that comports with 28 U.S.C. § 1746." (Doc. 49 at 1 n.1).

Upon consideration, the Court finds that little if any prejudice or delay resulted from the untimely filings. Thus, it is **ORDERED** that Knight's "motion to deem her summary judgment response filings as timely, or permitting the out of time filing of the supportive document" (Doc. 51) is **GRANTED**, such that her evidentiary submissions and response to FDE's statement of undisputed facts will be considered despite their untimely filing. In addition, Knight's physically signed declaration (Doc. 51-1) will be considered in lieu of her electronically signed declaration (Doc. 46), so as to pretermit issues concerning compliance with 28 U.S.C. § 1746.

FDE also objects to a number of passages in April Stewart's declaration, asserting that they are inconsistent with her previously given deposition testimony and therefore should be disregarded under the "sham affidavit" rule. "Under the law of this Circuit, [the Court] may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony. 'When a party has given clear answers to

14

unambiguous questions which negate the existence of any genuine issue of material fact [for summary judgment], that party cannot thereafter create such an issue with an affidavit that merely contradicts, *without explanation,* previously given clear testimony.' <u>Van T. Junkins and Assoc., Inc. v. U.S. Industries, Inc.</u>, 736 F.2d 656, 657 (11th Cir. 1984) (emphasis added). Such an affidavit would be a sham." <u>McCormick v. City of Fort Lauderdale</u>, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003). However, " '[Eleventh Circuit] cases require the court to find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit.' " <u>Allen v. Bd. of Pub. Educ. for Bibb Cnty.</u>, 495 F.3d 1306, 1316 (11th Cir. 2007) (quoting <u>Tippens v. Celotex Corp.</u>, 805 F.2d 949, 954 (11th Cir. 1986)).

In response to this argument, Knight has submitted a second declaration by Stewart (Doc. 50-1) explaining that any discrepancies between her declaration and her earlier deposition testimony are due to a combination of being nervous at deposition, misunderstanding some questions, other questions not being clear, misspeaking at times, and remembering (or clarifying her recollection of) certain incidents only after her deposition was taken. She also notes that at least one incident recounted in her first declaration occurred after her deposition was taken.

After considering the parties' arguments on this issue and comparing the relevant portions of Stewart's first declaration with those of her deposition testimony, the Court finds insufficient cause to disregard those portions of Stewart's declaration to which FDE objects as a sham and thus **OVERRULES** those objections. The Eleventh Circuit has cautioned that the <u>Van T. Junkins</u> "sham affidavit" rule is to be "applied 'sparingly because of the harsh effect [it] may have on a party's case.' " <u>Allen</u>, 495 F.3d at 1316 (quoting <u>Rollins v. TechSouth</u>, 833 F.2d 1525, 1530 (11th Cir. 1987)). "Furthermore, 'to allow every failure of memory or variation in a witness' testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the ...

affiant ... was stating the truth.' " Id. (quoting Tippens, 805 F.2d at 953–54). To the extent there are "inherent inconsistencies" between Stewart's declaration and her deposition testimony, Stewart offers explanations for these discrepancies that appear at least plausible. Cf. McCormick, 333 F.3d at 1240 n.7 ("Because McCormick offers some explanation for why his statements directly contradict one another—an explanation that does not appear to us to be itself a complete sham—we will accept and credit McCormick's affidavit submitted on summary judgment."). "Although [Stewart]'s explanations may not credibly withstand cross-examination, weighing the contradictory statements along with the explanations for those contradictions are judgments of credibility. Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment." Id.

Finally, FDE specifically objects to the following passage from Stewart's declaration as inadmissible hearsay (Doc. 49 at 3 n.2): When an observation was made in Stewart's presence that there weren't many blacks working at the Citronelle McDonald's, "Sonya Hancock, who is white and was a manager, replied 'Deanna (the Store Manager) told her that we cannot hire that many blacks because of where we are, and how the business would look to the customers.' " (Doc. 45 at 1). To be admissible, this statement must come within a hearsay exception. If the affiant was Hancock, the statement would be admissible pursuant to Fed. R. Evid. 801(d)(2)(D) as the party's agent. However, Knight has not identified a hearsay exception that would allow Stewart to testify to the double hearsay statement. See Kidd v. Mando Am. Corp., 731 F.3d 1196, 1208 n.15 (11th Cir. 2013) ("To be sure, we do not suggest that if Kidd were able to prove that this statement was based on an observation Rolison made or something he was told by the Mando decisionmakers that it would automatically be admissible as an admission by a party opponent. Kidd would still have to identify an additional exception to the rule against hearsay because it is Rolison's—rather than the Mando decisionmakers'—statement itself that has to be admissible."). Thus, the Court **SUSTAINS**

this objection, and this statement by Stewart will not be considered.

### b. Title VII and § 1981 Racial Discrimination Claims (Count I)

"Title VII prohibits an employer from discriminating against a person based on the person's race. 42 U.S.C. § 2000e–2(a)(1). Under 42 U.S.C. § 1981, an employee has a right to be free of discrimination by an employer based on race in the performance of a contract . . . The elements to establish an employment discrimination claim under § 1981 . . . are the same as those required under Title VII. Howard v. BP Oil Co., 32 F.3d 520, 524 n.2 (11th Cir. 1994) (Section 1981 claims) . . ." Porter v. Am. Cast Iron Pipe Co., 427 F. App'x 734, 736 (11th Cir. 2011).[8] " 'A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or statistical proof.' " Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010) (quoting Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1274 (11th Cir. 2008). "Direct evidence of discrimination is 'evidence that, if believed, proves the existence of a fact without inference or presumption.' Under Eleventh Circuit law, 'only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination.' " Dixon v. The Hallmark Companies, Inc., 627 F.3d 849, 854 (11th Cir. 2010) (quoting Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) (citations and quotation marks omitted)) (internal citation omitted). Knight does not present, nor argue the existence of, direct evidence or statistical proof of discrimination by FDE. "Lacking direct evidence, [Knight] must prove her discrimination claim circumstantially." Alvarez, 610 F.3d at 1264.

Courts in the Eleventh Circuit typically evaluate claims of discrimination based on circumstantial evidence

---

[8] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2 (effective Dec. 1, 2013).

using the framework established by the Supreme Court in <u>McDonnell Douglas Corp.</u> <u>v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and <u>Texas Dep't. of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). <u>Wilson[ v. B/E Aerospace, Inc.</u>], 376 F.3d [1079,] 1087[ (11th Cir. 2004)]. Under that framework the plaintiff must first establish a prima facie case of discrimination, typically by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast to similarly situated employees outside the protected class. <u>See id.</u> The methods of presenting a prima facie case are flexible and depend on the particular situation. <u>Id.</u>

Once the plaintiff has made a prima facie case, a rebuttable presumption arises that the employer has acted illegally. <u>Id.</u> The employer can rebut that presumption by articulating one or more legitimate non-discriminatory reasons for its action. <u>Id.</u> If it does so, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination. <u>Id.</u> Despite these shifts in the burden of production, the ultimate burden of persuasion remains on the plaintiff to show that the defendant intentionally discriminated against her. <u>Burdine</u>, 450 U.S. at 253, 101 S. Ct. at 1093; <u>Wilson</u>, 376 F.3d at 1088. Showing only that the employer's proffered reason is false does not necessarily entitle a plaintiff to get past summary judgment. <u>See Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000) (stating that even if plaintiff disproved employer's proffered explanation, employer would still be entitled to judgment as a matter of law if the record "conclusively revealed some other, nondiscriminatory reason" for its decision); <u>Chapman[ v. AI Transp.</u>], 229 F.3d [1012,] 1025 n.11[ (11th Cir. 2000) (<i>en banc</i>)] (applying <u>Reeves</u> in summary judgment context).

<u>Id.</u> at 1264-65.

In her Complaint, Knight "contends that her termination was due to her race . . ." (Doc. 1 at 3, ¶ 11). In its brief in support of its motion for summary judgment (Doc. 38 at 14), FDE argues that, "[t]o establish a prima facie case of discriminatory discharge, [Knight] must demonstrate that (1) she is a member of a protected class; (2) she was qualified for the job she held; (3) she suffered an adverse employment action; and (4) she was replaced by someone outside her protected class." (Doc. 38 at 14 (citing <u>Cuddeback v. Fla. Bd. of Educ.</u>, 381 F.3d 1230, 1235 (11th Cir. 2004))). FDE argues that Knight cannot satisfy this test because she was replaced by an African American

female and thus cannot show she was replaced by someone outside of her protected class.  (Doc. 38 at 15).

In her response, Knight correctly asserts that "defendant's reliance on Cuddeback is misplaced."  (Doc. 44 at 4).  Knight instead argues that she can establish a *prima facie* case of discrimination using the method established by McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273 (1976).  (Doc. 44 at 4).  "In McDonald . . . , the Court held that an employer would violate Title VII if it fired black employees who participated in a theft of cargo while retaining whites guilty of the same offense."  Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1185 (11th Cir. 1984) (citing McDonald, 427 U.S. at 282-84).  As such, "a plaintiff fired for misconduct makes out a prima facie case of discriminatory discharge if he shows that he is a member of a protected class, that he was qualified for the job from which he was fired, and that the misconduct for which he was discharged was nearly identical to that engaged in by an employee outside the protected class whom the employer retained.  The prima facie case is established even if the plaintiff's replacement is also a member of the protected class . . . When an individual proves that he was fired but one outside his class was retained although both violated the same work rule, this raises an inference that the rule was discriminatorily applied against that individual, regardless of the race or sex of the replacement."  Id. (citations and quotation omitted).  See also Hawkins v. Ceco Corp., 883 F.2d 977, 984 (11th Cir. 1989) ("If disciplinary rules are applied discriminatorily, it is unnecessary to show that plaintiff was replaced by a nonminority.").

"[I]n cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct."  Jones v. Gerwens,

874 F.2d 1534, 1540 (11th Cir. 1989). Accord Rioux, 520 F.3d at 1276 ("Where the racial discrimination is alleged in the application of work rules to discipline an employee, and where there is no claim that the employee did not violate the work rules, as here, then plaintiff must show 'that he engaged in misconduct similar to that of a person outside the protected class, and … the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.' " (quoting Moore v. Ala. Dep't of Corr., 137 F. App'x 235, 238 (11th Cir. 2005) (citing Gerwens, 874 F.2d at 1540)). Cf. Wilson, 376 F.3d at 1092 ("Wilson attempts to prove that she was terminated because of her sex in two ways. *She first asserts that she was not guilty of insubordination*. She next speculates that B/E terminated her because 'she was discriminatorily passed over for promotion, knew it, and discomfited her superiors by complaining of it[.]' " (emphasis added)).

Knight cannot rely on a showing that she did not violate a work rule, as she admits to "refus[ing] a supervisor's instructions at McDonald's . . . [o]ne time . . . [t]he day they fired [her]."[9] (Doc. 38-2 at 19-20, Knight Depo. p. 72). Therefore, under Gerwens and Rioux, Knight would be obligated to identify an employee outside of her protected class who engaged in misconduct similar to hers and was disciplined less harshly (i.e. not terminated) in order to establish a *prima facie* case.

When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, [courts] evaluate "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."

---

[9] Gerwens was issued by a 3-judge panel. A later panel decision stated: "[O]ur impression is that words about 'did not violate the work rule' are unnecessary to the decision in Jones[ v. Gerwins] and are dicta." Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 n.6, opinion modified on other grounds, 151 F.3d 1321 (11th Cir. 1998). Regardless, the later panel "stress[ed] that, under the Jones[ v. Gerwins] formulation, no plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule. The plaintiff must also point to someone similarly situated (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better." Id. See also Hamilton v. Coffee Health Grp., No. CV-10-S-3621-NW, 2013 WL 2635304, at n.230 (N.D. Ala. June 6, 2013) (recognizing that the "holding [in Jones v. Gerwins ]was questioned in" Jones v. Bessemer Carraway).

> Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999) (citations and quotation
> marks omitted). When making that determination, "[w]e require that the quantity and
> quality of the comparator's misconduct be nearly identical to prevent courts from
> second-guessing employers' reasonable decisions and confusing apples with
> oranges." Id. (citation omitted); see also Nix v. WLCY Radio/Rahall Commc'ns, 738
> F.2d 1181, 1185 (11th Cir. 1984) (requiring a plaintiff bringing a discriminatory
> discipline claim to show "that the misconduct for which he was discharged was
> nearly identical to that engaged in by an employee outside the protected class whom
> the employer retained") (citations, quotation marks, and alterations omitted).

Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006) (per curiam) (footnote

omitted). Accord McCann v. Tillman, 526 F.3d 1370, 1373-74 (11th Cir. 2008); Anderson v.

WBMG-42, 253 F.3d 561, 564 (11th Cir. 2001) ("Evidence that similarly situated employees are

disciplined more leniently is admissible to support a disparate treatment claim when the plaintiff has

established that the co-employees are in fact similarly situated. See Nix v. WLCY Radio/Rahall

Communications, 738 F.2d 1181, 1186 (11th Cir. 1984). Thus, the plaintiff must show that the

comparator employees are 'involved in or accused of the same or similar conduct' yet are

disciplined in a different, more favorable manner. Holifield v. Reno, 115 F.3d 1555, 1562 (11th

Cir. 1997)."). "Misconduct merely 'similar' to the misconduct of the disciplined plaintiff is

insufficient." Rioux, 520 F.3d at 1280 (citing Burke-Fowler, 447 F.3d at 1323 n.2).

Knight cites Paula Byrd, Kenny Alexander, and Sammy Marks as employees who engaged

in similar conduct but were not fired. Specifically, Knight points to Paula Byrd's deposition in

which she stated that she personally had used the same phrase ("hell no") in refusing to perform a

duty as ordered by a manager, and she did not suffer termination or any discipline. In presenting

evidence of Kenny Alexander and Sammy Marks's misconduct as comparator evidence, Knight

relies on the following passages from the declaration of April Stewart, who was a shift manager at

the Citronelle McDonald's during Knight's employment:

6. When I served as a manager, a white crew member named Kenny Alexandra [sic] cursed me in a loud voice in front of customers, and even though I reported this to higher management, nothing was done to address the situation. Kenny also has many write-ups in his file because of disrespecting managers, usually in front of others, and had received several write-ups for cash register shortages.

7. Sammy Marks cursed Sonya Hancock in front of a lobby full of people stating that "they were going to pay him his Fucking money". He was complaining about his check been [sic] short, and he created a major scene in front of customers and staff with his actions, and he was not disciplined to my knowledge. Sammy was the type of employee who was always late, sometimes he did not show up for work without calling in, and he was constantly cursing on shift.

(Doc. 45 at 4).

Cauley states that Knight's "employment was terminated for insubordination, using profanity toward a manager, and being disruptive on February 8, 2012. In making the decision to terminate [Knight]'s employment, [Cauley] also considered [Knight]'s prior disciplinary record." (Doc. 38-1 at 9, ¶ 28). While Knight denies committing most of the misconduct that FDE attributes to her, she does admit to "refus[ing] a supervisor's instructions at McDonald's . . . [o]ne time . . . [t]he day they fired [her]." (Doc. 38-2 at 19-20, Knight Depo. p. 72). As FDE correctly points out in its reply, none of the cited incidents involving Alexander and Marks "involved insubordination . . . . which was the case in the incident involving [Knight] on February 8, 2012."[10] (Doc. 48 at 5). As Knight has not cited any incident in which either Marks or Alexander were insubordinate, neither can be considered "similarly situated" to Knight. See Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1312-13, opinion modified on other grounds, 151 F.3d 1321 (11th Cir. 1998) ("Plaintiff also claims that Clark was a similarly situated employee because she frequently was unprepared for work—she would have curlers in her hair and put makeup on during report—and had a pretty poor

---

[10] FDE correctly points out that while Knight's "brief alleges that Mr. Alexander refused a manager's instructions, Ms. Stewart's declaration does not contain this allegation." (Doc. 48 at 5 n.2).

tardiness record. This claim, however, ignores that Plaintiff was not terminated only because she was unprepared; instead, she was terminated for being unprepared *and* insubordinate, in the light of an already deficient employment record. No evidence shows that Clark was insubordinate or was accused of being insubordinate in conjunction with her unpreparedness." (footnote omitted)); Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316-17 (11th Cir. 2003) ("A review of Knight's and Arnold's cumulative records reveals that the two were not similarly situated. While their histories of problems with coworkers are similar, Arnold's record is substantially better then Knight's when it comes to job performance and tardiness."). Cf. Burke-Fowler, 447 F.3d at 1325 ("The comparators presented by Burke-Fowler did not engage in misconduct that was 'nearly identical' to hers. Robinson and Austin did fraternize with inmates; however, the differences between their conduct and Burke-Fowler's are significant. Burke-Fowler pursued a romantic relationship with an incarcerated person shortly after he left her direct supervision. Robinson and Austin had relationships with people who subsequently became incarcerated. Smith and Pipkins were not romantically involved with inmates. None of them are appropriate comparators." (citation omitted); McCann, 526 F.3d at 1375 ("McCann's conduct is qualitatively different from that of the comparators she provided because her conduct involved an abuse of office, while the conduct of the comparators did not. Consequently, because McCann has not presented proper comparators, she has failed to establish a prima facie case of discrimination with respect to her suspension, and the burden will not be shifted to the appellees to provide a legitimate, nondiscriminatory reason for their actions."); Bell v. Crowne Mgmt., LLC, 844 F. Supp. 2d 1222, 1229 (S.D. Ala. 2012) (Steele, C.J.) ("The problem for the plaintiff is that, under even her version of events, White did not strike Tullis, and yelling, cursing and wanting to hit another is not conduct 'nearly identical' to actually hitting the other. In Floyd v. Federal Express Corp., 423 Fed.Appx. 924 (11th Cir. 2011), the plaintiff was fired because he took a swing at his comparator, who may or may have not been dealt

a glancing blow. The comparator cursed the plaintiff and pointed his finger in the plaintiff's face without intending to hit him. The Eleventh Circuit ruled that the comparator's conduct was not nearly identical to the plaintiff's. Id. at 930–31. In light of <u>Floyd</u>, White's non-physical conduct cannot be considered nearly identical to the plaintiff's battery.").

Moreover, Knight has not shown that either Marks or Alexander had a sufficiently similar disciplinary record as her, which Cauley considered in making her decision to terminate Knight (<u>see</u> Doc. 38-1 at 9, ¶ 28). Stewart's general assertions that Alexander had "many" write-ups for disrespecting managers and "several" for register shortages, and that Marks "was always late, sometimes he did not show up for work without calling in, and he was constantly cursing on shift" are insufficient to show that they had similar disciplinary histories as she and thus that the "quantity and quality of [their] misconduct [is] nearly identical" to that of Knight, <u>Maniccia v. Brown</u>, 171 F.3d 1364, 1368 (11th Cir. 1999), given that FDE has presented documentation describing fourteen specific instances of Knight's misconduct.[11]

---

[11]     "Knight disputes that [most] of these [documented disciplinary] events occurred. What is important is that these events were documented in her record. Even if, as Knight claims, the events did not actually occur, they can be considered if [Cauley] (the decision-maker) honestly believed they occurred. <u>See Jones v. Gerwens</u>, 874 F.2d 1534, 1540 (11th Cir. 1989) ('The law is clear that, even if a Title VII claimant did not in fact commit the violation ... an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation.')." <u>Knight v. Baptist Hosp. of Miami, Inc.</u>, 330 F.3d 1313, 1318 n.6 (11th Cir. 2003) (finding that the plaintiff had "failed to establish a prima facie case of discrimination" due to her failure to identify a comparator with a sufficiently similar disciplinary record, and expressly declining to address the subject of pretext (as stated in footnote 2)). <u>See also Holifield v. Reno</u>, 115 F.3d 1555, 1565 (11th Cir. 1997) ("[W]here the employer produces performance reviews and other documentary evidence of misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence."); <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d 1079, 1092 (11th Cir. 2004) ("Wilson's self-serving assertion that she was not insubordinate does not alone establish that she was terminated because of her sex. A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by sex." (quotation omitted)); <u>Elrod v. Sears, Roebuck & Co.</u>, 939 F.2d 1466, 1470 (11th Cir. 1991) ("Much of Elrod's proof at trial centered around whether Elrod was in fact guilty of the sexual harassment allegations leveled at him by his former co-workers. We can assume for purposes of this opinion that the complaining employees interviewed by Rives were lying through their teeth. The inquiry of the ADEA is limited to whether Rives, Malone and Merrill *believed* that Elrod was guilty of harassment, and if so, whether this belief was the reason behind Elrod's discharge. <u>See Hawkins v.</u>

In that same vein, Byrd's one cited incident of alleged misconduct (though arguably involving insubordination) does not make her a "similarly situated comparator" to Knight and her more extensive disciplinary record.[12]   See Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001) ("Silvera cannot meet th[e comparability] requirement, because the number of arrests on his record exceeds by a factor of two (if Ritter's DUI arrest is counted) or a factor of four (if it is not) those of his would-be comparator."); Maniccia, 171 F.3d at 1369 ("Each of these male officers was involved in a single incident of misconduct or alleged misconduct, whereas Appellant

Ceco Corp., 883 F.2d 977, 980 n.2 (11th Cir. 1989), cert. den., 495 U.S. 935, 110 S. Ct. 2180, 109 L. Ed. 2d 508 (1990) (That the employee did not in fact engage in misconduct reported to the employer is irrelevant to the question whether the employer believed the employee had done wrong.).").

Knight cites to Muñoz v. Oceanside Resorts, Inc., 223 F.3d 1340 (11th Cir. 2000), for the proposition that whether Cauley had a good faith belief that Knight engaged in the misconduct alleged against her is a jury question.  In Muñoz, the Eleventh Circuit, in affirming the denial of an employer defendant's motion for judgment as a matter of law, held:

> Muñoz testified that he never confronted Rea in defiance of Gonzalez's instruction not to discuss his reprimand. Muñoz's testimony directly contradicted that of Rea, creating a factual conflict properly resolved by the jury. The jurors could have credited the testimony of either Muñoz or Rea, as such determinations are within their province, and neither the district court nor this court may substitute its judgment for theirs. The Resort, however, contests the relevance of whether or not the confrontation actually occurred; in its own words, "[a]ll that matters is whether Rea told, truthfully or not, Gonzalez of the alleged confrontation."  In the Resort's view, Gonzalez's subjective belief that the confrontation occurred justified his decision to terminate Muñoz. The Resort, however, underestimates the effect that impugning Rea's credibility might have had on the jury. Rea was the Resort's only witness at trial and therefore the only person to testify that she informed Gonzalez of a confrontation. If the jury rejected Rea's testimony concerning the alleged confrontation, it likewise could reject her further testimony regarding the reporting of that incident. A reasonable jury accordingly could accept Muñoz's theory of events: that Gonzalez concocted a scheme that included both a bogus reprimand and a subsequent false accusation of insubordination to cover his discriminatory desire to discharge an older employee.

223 F.3d at 1345 (footnotes and citation omitted).  This holding is distinguishable from the instant case.  In Muñoz, there was a genuine issue of fact as to whether the alleged incident precipitating the plaintiff's termination had even been reported to the decision-maker, thus creating a jury question as to whether the decision-maker honestly relied on the incident in making the decision to terminate the plaintiff.  While Knight contests having committed most of the misconduct attributed to her, she has presented no evidence suggesting that Cauley did not in fact receive notice of these alleged incidents of misconduct, both in the form of written reports and oral accounts.

[12] FDE argues that Byrd said "hell, no" in a joking manner and was not refusing a manager's order when she said it. (Doc. 48 at 4-5).  However, even Byrd acknowledged that this was a violation of rules. (Doc. 38-7 at 17, Byrd Depo. p. 64).

committed at least four policy violations.").

Finally, as FDE correctly points out in its reply, Knight cites "no evidence that Ms. Cauley knew of the comparators' alleged misconduct . . ." (Doc. 48 at 8). "[P]roffered comparators' actions are only relevant if the plaintiff shows that the decisionmaker knew of the prior similar acts and did not discipline the rule violators." Lee v. U.S. Steel Corp., 450 F. App'x 834, 839 (11th Cir. 2012) (citing Gerwens, 874 F.2d at 1542 ("A prima facie case of discriminatory motive must show that either Runnerstrom or Gerwens was aware of prior uses of the Unit truck by white officers for personal business or prior instances in which unauthorized persons had been permitted to ride in the truck, and that the known violations were consciously overlooked. For the purposes of this Title VII action, Sergeant Dietrich's previous tolerance of Unit truck use for personal business would be relevant only if it could be shown that either Runnerstrom or Gerwens knew of such practices and did not act to discipline rule violators. As Jones has failed to adduce evidence of knowledge on the part of Runnerstrom or Gerwens, he has failed to make out a prima facie case of disparate treatment." (footnotes omitted)).

For the foregoing reasons, the Court finds that Knight has failed to identify a "similarly situated" comparator for purposes of establishing a *prima facie* case of "work rule" discrimination. However, even assuming that Knight has established a *prima facie* case of discrimination, the Court finds that she has not presented sufficient evidence of pretext.

Had Knight successfully demonstrated a *prima facie* case, FDE would then be required to articulate a legitimate, non-discriminatory reason for terminating Knight. "An employer's burden to articulate a non-discriminatory reason . . . is a burden of production, not of persuasion. As this burden involves no credibility determination, it has been characterized as exceedingly light. So long as the employer articulates a clear and reasonably specific non-discriminatory basis for its actions, it has discharged its burden of production." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d

763, 769-70 (11th Cir. 2005) (citations and quotations omitted). See also Alvarez, 610 F.3d at 1265 ("The defendant need not persuade the court that it was actually motivated by the proffered reason, but need only present evidence raising a genuine issue of fact as to whether it discriminated against the plaintiff. However, the defendant's response must frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." (citation and quotation omitted)). Knight "would agree with the defendant that the stated reasons are legitimate, nondiscriminatory reasons to terminate an employee[,]" (Doc. 44 at 6), thus eliminating any *prima facie* presumption of discrimination. See Rioux, 520 F.3d at 1277 ("Because the parties agree Appellees had a legitimate, nondiscriminatory reason for Rioux's demotion following the OPS and Law Department investigations, the presumption of discrimination is eliminated . . ."). Even absent this admission, the Court would find that FDE's stated reasons for terminating Knight – "insubordination, using profanity toward a manager, and being disruptive on February 8, 2012[,]" in conjunction with Knight's previous disciplinary record prior disciplinary record - satisfy FDE's burden to produce legitimate, non-discriminatory reasons for terminating Knight. See Muñoz v. Oceanside Resorts, Inc., 223 F.3d 1340, 1345 (11th Cir. 2000) ("Once Muñoz established a prima facie case of discrimination, an intermediate burden of production shifted to the Resort to proffer a legitimate, nondiscriminatory reason for Muñoz's termination . . . The Resort satisfied that burden by explaining that it terminated Muñoz for insubordination."); Thomas v. Miami Veterans Med. Ctr., 290 F. App'x 317, 320 (11th Cir. 2008) ("Even assuming *arguendo* that Thomas established a *prima facie* case, the VA stated that it fired her for failure to follow supervisory instructions, wilful resistance to the instructions, and disrespectful conduct. These reasons were legitimate and non-discriminatory.").

This burden having been met,

[t]he burden then shifts back to the plaintiff to show that the employer's proffered reason was not its true reason, which merges with the plaintiff's ultimate burden of persuading the court that the employer intentionally discriminated against her . . . [Knight] may satisfy her burden either by offering evidence that [FDE] more likely than not acted with a discriminatory motive, or by showing that its proffered reasons are not credible, unless the record conclusively shows that the real motive was a non-proffered reason that is non-discriminatory. To show pretext, [Knight] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence. A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute her business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and she cannot succeed by simply quarreling with the wisdom of that reason.

Alvarez, 610 F.3d at 1265-66 (citations and quotations omitted). See also Campbell v. Shinseki, No. 13-11974, 2013 WL 6153250, at *3 (11th Cir. Nov. 25, 2013) ("A plaintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)). "The evidence of pretext may include . . . the same evidence offered initially to establish the prima facie case." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th Cir. 2004).

The Eleventh Circuit has cautioned:

In analyzing issues [of pretext], "we must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees." Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002); cf. Wilson, 376 F.3d at 1092 ("Whether [plaintiff's] conduct was insubordinate is not an issue for this Court to referee."). The question to be resolved is not the wisdom or accuracy of [the decision-maker]'s conclusion that [the plaintiff]'s performance was unsatisfactory, or whether the decision to fire her was "prudent or fair." See Rojas, 285 F.3d at 1342. Instead, "our sole concern is whether unlawful discriminatory animus motivate[d]" the decision. Id. (quotation marks and citation omitted) . . . Title VII does not require the employer's needs and expectations to be objectively reasonable; it simply prohibits the employer from discriminating on the basis of membership in a protected class.

We do not sit as a "super-personnel department," and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive. Chapman, 229 F.3d at 1030. That is true "[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers." Id. (quotation marks and citations omitted); see also Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984) ("[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."); Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1399 (7th Cir. 1997) (listing, among "embarrassing" but non-actionable reasons under Title VII, "nepotism, personal friendship, the plaintiff's being a perceived threat to his superior, a mistaken evaluation, the plaintiff's being a whistleblower, the employer's antipathy to irrelevant but not statutorily protected personal characteristics, a superior officer's desire to shift blame to a hapless subordinate ... or even an invidious factor but not one outlawed by the statute under which the plaintiff is suing; ... or there might be no reason").

Alvarez, 610 F.3d at 1266-67. Accord Kidd v. Mando Am. Corp., 731 F.3d 1196, 1207 (11th Cir. 2013). See also Nix, 738 F.2d at 1187 ("Title VII is not a shield against harsh treatment at the workplace. Nor does the statute require the employer to have good cause for its decisions." (citation and quotation omitted)).

"Similar misconduct" comparator evidence can be used to establish pre-text. See Rioux, 520 F.3d at 1276-77 ("While Rioux has always maintained in his two complaints that another employee was similarly situated to him but was disciplined less severely than he . . . , it appears he has raised the comparator issue not as an element of his prima facie showing, but rather, as evidence of pretext, the third step of the McDonnell Douglas burden-shifting framework. See e.g., Silvera v. Orange County School Board, 244 F.3d 1253, 1259 (11th Cir. 2001) (where court examined, as part of the complainant's showing of pretext, whether there was any disparate treatment of a similarly situated employee of a different race); McDonnell Douglas, 411 U.S. at 804, 93 S. Ct. 1817 ('Especially relevant' to a showing of pretext 'would be evidence that white employees involved in

acts against petitioner of comparable seriousness ... were nevertheless retained or rehired.'); Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1563 n.20 (11th Cir. 1987) (noting that comparator evidence may be used to show pretext)."); Damon v. Fleming Supermarkets Of Fla., Inc., 196 F.3d 1354, 1363 (11th Cir. 1999) (Where a plaintiff is "terminated for alleged violations of company work rules[,] . . . [o]n summary judgment, . . . the 'work rule' defense is arguably pretextual when a plaintiff submits evidence (1) that she did not violate the cited work rule, or (2) that if she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated.");[13] Rawls v. Ala. Dep't of Human Res., 507 F. App'x 895, 898 (11th Cir. 2013) ("In the disciplinary context, the plaintiff may show pretext by identifying a similarly situated employee who was not disciplined after engaging in similar conduct as the plaintiff. Rioux, 520 F.3d at 1276–77."); Walker v. St. Joseph's/Candler Health Sys., Inc., 506 F. App'x 886, 889 (11th Cir. 2013) ("A typical means of establishing pretext is through comparator evidence.").

Knight attempts to use "comparator" evidence to show pretext. (See Doc. 44 at 11 ("Plaintiff has shown pretext in the stated reasons put forth by the defendant as its legitimate, non-discriminatory reasons for Plaintiff's termination [as, *inter alia*,] there are at least three employees who have committed a similar offense, but they remain employed by the defendant.")). As has already been determined, for purposes of establishing a *prima facie* case, Knight has failed to establish a "similarly situated" comparator employee – one outside of her protected class who was not fired despite committing nearly identical misconduct *and* having a nearly identical disciplinary history. For these same reasons, see *supra*, Knight has not established pretext by pointing to a similarly situated comparator.

---

[13] "Of course, this framework is simply used to assess whether a plaintiff has presented sufficient evidence to establish pretext-that is, the employer has not given an honest explanation of the employer's behavior-and thereby reach a jury on the ultimate question of discrimination. This framework, however, does not vitiate a plaintiff's ultimate burden to prove by a preponderance of the evidence that an employer terminated the plaintiff based on a discriminatory motive." Damon, 196 F.3d at 1363 n.3.

Knight also disputes much of FDE's account of the February 8, 2012 incident, as well as her previous disciplinary history, and attempts to argue that her denying such misconduct occurred creates a genuine issue of material fact. However, "[t]he law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation." Gerwens, 874 F.2d at 1540. Accord Abel v. Dubberly, 210 F.3d 1334, 1338 (11th Cir. 2000). "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." Alvarez, 610 F.3d at 1266 ("The question is not whether it really was Alvarez's fault that assignments were not completed on time, or whether she did delegate excessively, or whether she was aggressive and rude to her colleagues and superiors, or whether she actually lost an important document or truly did fall asleep at her desk. The question is whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints about Alvarez as cover for discriminating against her because of her Cuban origin. See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (inquiry is limited to whether employer believed employee was guilty of misconduct and if so, whether that was reason behind discharge; that employee did not actually engage in misconduct is irrelevant).").

Moreover, "[i]n reaching an employment decision, an employer is free to weigh the credibility of different witnesses: 'When the resulting employer's investigation ... produces contradictory accounts of significant historical events, the employer can lawfully make a choice between the conflicting versions ..., as long as the choice is an honest choice.' " Knight v. Fla. Dep't of Transp., 291 F. App'x 955, 959 (11th Cir. 2008) (quoting EEOC v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000)).

31

The undisputed evidence indicates that Cauley, the decision-maker, was not present for the February 8, 2012 incident directly leading to Knight's termination and instead relied on second-hand accounts (both written and verbal) of that incident from other FDE employees in making her decision, most of which paint a more damning picture of the incident than the version presented by Knight. Knight has presented no evidence indicating either that Cauley was not actually aware of these accounts (and therefore could not have relied on them in making her decision) or that Cauley did not make "an honest choice" in crediting the other employees' versions of the incident.[14] Knight has also presented no evidence indicating that Cauley did not also honestly rely on the documented cases of prior misconduct in Knight's personnel folder in making her decision.[15]

As Knight can neither establish a *prima facie* case of discriminatory discipline nor rebut as pretext FDE's legitimate, non-discriminatory reasons for her termination, she cannot survive summary judgment under the <u>McDonnell Douglas</u> framework. However, the Eleventh Circuit has

---

[14] For instance, while Knight admits only to using the word "hell" during the incident leading directly to her termination and makes much of Cauley's testimony that she doesn't consider "hell" a curse work (<u>see</u> Doc. 44 at 8-10), Cauley was also orally informed by DeSalvo that Knight also used the word "fuck" during the incident. Knight attempts to undermine this information by denying that she said such a term and pointing out that none of the written statements documented Knight's use of this term. Whether Knight used this term is irrelevant for purposes of showing pretext. Rather, Knight must present evidence indicating that Cauley either was not actually told this information (whether it be true or false) or did not honestly rely on it in making her decision to terminate Knight. <u>See</u> <u>Alvarez</u>, 610 F.3d at 1266. This she has not done.

[15] Knight appears to deny even the existence of the disciplinary notices in her work record, stating: "If there are disciplinary notices in Plaintiff's personnel file they were placed there without any discussion or notice to her of a work rule violation. If anything, they were placed there without her knowledge and signature simply to justify any adverse action the defendant decided to take against me. It was common knowledge that certain individuals wanted Plaintiff terminated and the bogus disciplinary notices served that purpose." (Doc. 47 at 3). Knight's unsubstantiated opinions regarding the veracity of the produced exhibits and FDE's motive for creating these documents are insufficient to create a genuine issue of material fact. <u>See</u> <u>Holifield</u>, 115 F.3d at 1565 ("Holifield has failed to establish that the defendants' proffered reason is unworthy of credence, or that the defendants were more likely motivated by a discriminatory reason in taking their actions against Holifield. His assertion that the defendants began documenting an untrue assessment of his performance in order to terminate him because of his race is unsubstantiated." (citation omitted)).
Knight also takes issue with the fact that many of the disciplinary notices in her file were not signed by her or a manager but does not explain why this should impact Cauley's reliance on them. (Doc. 44 at 13).

held that "[t]he McDonnell Douglas framework is not . . . the only way to use circumstantial evidence to survive a motion for summary judgment, and a 'plaintiff's failure to produce a comparator does not necessarily doom [her] case.' " Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1255 (11th Cir. 2012) (quoting Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)). "Establishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case . . . Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.' " Smith, 644 F.3d at 1328 (quoting Silverman v. Bd. of Educ., 637 F.3d 729, 733 (7th Cir. 2011)) (internal citations and footnote omitted).

> A plaintiff may raise a reasonable inference of the employer's discriminatory intent through various forms of circumstantial evidence. Rioux v. City of Atlanta, 520 F.3d 1269, 1281 (11th Cir. 2008) (holding that the plaintiff established a prima facie case of racial discrimination when he did not present evidence of a comparator but presented other circumstantial evidence that was sufficient); see also Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010) (stating that the circumstantial evidence necessary to present a Title VII case of discrimination under McDonnell Douglas is "flexible and depend[s] on the particular situation" (citations omitted)); cf. Burke–Fowler v. Orange County, Fla., 447 F.3d 1319, 1325 (11th Cir. 2006) (affirming the district court's grant of summary judgment because plaintiff "failed to establish valid comparators and presented *no other circumstantial evidence suggesting racial discrimination*" (emphasis added)). Yet, no matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.

Id. An inference " 'is not a suspicion or a guess' " but rather " 'a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact[.]' " Id. n.25 (quoting Bickerstaff v.

Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999) (citations and internal quotation marks omitted)).[16]

In an attempt to show "sufficient evidence that if believed by a jury, it could find that intentional discrimination motivated [her] termination" (Doc 44 at 12), Knight cites deposition testimony of Robert Durgen, a co-worker of Knight at McDonald's. In response to a question asking "did you observe anything that would lead you to believe that [Knight] was being treated differently because of her race or age," Durgen stated that when Kristina Hyatt "got moved up to swing[ manager], she made the comment that because she was moving up, she was going to get Ms. Ursula fired." (Id.) Durgen "didn't think this was appropriate." (Id.) In her unsworn declaration, April Stewart also states that Hyatt purportedly "told several crew members that she could not wait to become a manager so that she could get rid of Ms. Knight." (Doc. 45 at 3, ¶ 4).

This statement does not support an inference that racial animus motivated Knight's termination. For one thing, the undisputed evidence indicates that Hyatt was not involved in either the February 8, 2012 incident or in Cauley's decision to terminate Knight. Moreover, at most, Hyatt's statements express an unspecified dislike of Knight and do not suggest any racial animus. In fact, Stewart's declaration explains that Hyatt "did not like the fact that Ms. Knight would

---

[16] Another judge of this district has questioned the overall impact of Smith on a plaintiff's burden to establish a *prima facie* case of discrimination. See Bell v. Crowne Mgmt., LLC, 844 F. Supp. 2d 1222, 1232-34 (S.D. Ala. 2012) (Steele, C.J.) ("To the extent that Smith suggests the burden-shifting paradigm of McDonnell Douglas can be ignored in a case based on circumstantial evidence, freeing the plaintiff from any obligation to establish a prima facie case, it is in tension with a long line of Eleventh Circuit precedent. It is to that extent also in tension with McDonnell Douglas itself: 'The complainant in a Title VII trial *must* carry the initial burden under the statute of establishing a prima facie case of racial discrimination.' 411 U.S. at 802, 93 S. Ct. 1817 (emphasis added) . . . Better established is the view that the elements of the prima facie case can be modified . . . It cannot easily be concluded that the Eleventh Circuit has carefully constructed a strict, "nearly identical" standard for satisfying the third element of the prima facie case for a claim of discriminatory discipline only to allow that element to be freely substituted with, and satisfied by, any weak, amorphous whiff of discrimination . . . It must therefore be assumed that any evidence offered under Schoenfeld[ v. Babbitt, 168 F.3d 1257 (11th Cir. 1999)] and Smith in lieu of a nearly identical comparator must suggest discrimination with force similar to that implied by treating nearly identical offenders differently. This is consistent with Smith's requirement of a 'convincing mosaic' of evidence and with Schoenfeld's requirement that the prima facie case be grounded on evidence making it more likely than not that the adverse employment action was based on illegal discrimination." (footnote omitted)).

complain about her standing around[,]" further undermining any effort to cast Hyatt's purported statements in a racial context. (Doc. 45 at 3-4, ¶ 5). See Hawkins v. Ceco Corp., 883 F.2d 977, 986 (11th Cir. 1989) ("Hawkins presented evidence that Rascoe did not like him, but a dislike alone is not evidence of racial discrimination."); Jackson v. State of Ala. State Tenure Comm'n, 405 F.3d 1276, 1291 (11th Cir. 2005) ("Jackson . . . points to a statement in a letter that was written by someone outside the Board to then-Superintendent Dr. Connell. The letter discusses how the school should deal with the problems caused by Jackson's distributing confidential documents at a Board meeting the day before. Part of the letter to Dr. Connell says that Ralph Gaines, the Board's attorney, had stated that 'this might be what we have been waiting on to move toward taking action on Mr. Jackson.' Jackson argues that the hearsay in this letter is evidence that the Board was developing a pretext so it could terminate him on account of his race. This argument is not tenable . . . The letter, with its 'what we have been waiting on' language, does suggest that at least Dr. Connell was contemplating taking some kind of action against Jackson. (Dr. Connell was not on the Board but her recommendation to commence termination proceedings was a prerequisite to the Board firing Jackson.) Even if we assume that her desire to take action against Jackson can be attributed to the Board, that does not mean that the desire was born of racism.").

Knight also points to other passages in Stewart's declaration that purportedly show (in her own words) "a litany of instances where race motivated everything from hiring decisions, discipline, and job assignments" (Doc. 44 at 13-18):

- Having worked at the Citronelle McDonald's since its opening in 2010, Stewart's "opinion" is that "the management staff there has shown favoritism toward the white employees from day one."

- A white customer in the drive-up line asked whether Stewart was black or white. When

Stewart asked him to repeat the statement, the customer asked "Are you a nigger?" This statement was audible to others in the restaurant. A manager on duty told Stewart to refuse service to that customer. Cauley, however, told that manager "no" and to put someone else at the drive-up window to take that customer's order.

- Management would make consistent efforts to limit the number of black employees. On many occasions, when black applicants would come by the store asking about vacancies, Stewart observed them being told to come back for an interview on a specific day. After the black applicants were interviewed, however, they were told there were no vacancies; a white applicant would then be hired. Sonya Hancock usually handled hiring at her own discretion but would have to seek Cauley's approval to hire any black applicant.[17]

- Black employees were told that family members could not be hired, but several white employees had brothers or sisters who were also hired. Genissa Reese's mother applied to work at the McDonald's but was told that she couldn't work there because her daughter already worked there, with management giving "the mother the run around" before telling her she would not be hired. The mother was asked to come back to the restaurant multiple times and each time was given "some excuse for not hiring her." Stewart also asked about her boyfriend being hired "and they gave [her] and him a hard time, and it was only after several months of asking and complaining before he was finally hired."

- Use of profanity on the job was "the norm" and was done by "many employees," even while addressing managers, without discipline. Stewart herself used profanity in refusing to perform a manager's request (Kristina Hyatt) to clean a bathroom and was not disciplined.

- Knight would often complain about Kristina Hyatt (white) standing around talking or

---

[17] Knight argues that this constitutes a violation of FDE's own normal hiring procedure and thus "may be evidence of discrimination." (Doc. 44 at 14).

playing on her cell phone rather than working, but was told by "the manager at the time" that management did not expect as much work out of "kids or children" as they did by adults.

- Jeremiah Pugh, a black crew member, was sent home after reporting to work "high" on marijuana and was later fired. However, Sammy Marks, a white employee, came to work "stoned out of his mind" and was allowed to remain at work even though Stewart asked management to send Marks home, as he was bothering the other employees.

- Managers at the restaurant would change work schedules without telling affected black employees. Regarding the January 12, 2012 reprimand against Knight for showing up to order food on a day she was scheduled to work, Stewart claims that Knight was not in fact scheduled to work that day, "unless there was a last minute schedule change, which happened often to black employees."

- No black employee was offered a management position at the Citronelle McDonald's. Stewart asked Hancock and Cauley why she was not promoted and was told that she needed a high school diploma or a GED. However, the same day she was interviewed by "the attorney for McDonalds . . . about the facts of this case," Stewart was told she was being promoted, despite still not having a GED or high school diploma. Before Stewart was promoted, the Citronelle McDonald's had had only one black manager, who was transferred in from a Mississippi restaurant, and "no local employee has ever been promoted to management prior to the filing of this lawsuit." Moreover, management refused to promote Stewart's boyfriend, who has a high school diploma, stating that he "must know every area of the store, and [they] d[id] not need any additional managers at th[e] time." A week later, however, a white manager was hired "who did not have experience in every area of the store

. . ."

- Scott Chestang (race unspecified) "was always using the 'N' word on the job," even in the presence of managers, including Hancock and Cauley, but no action was taken. Other employees complained about this to Cauley and Hancock and requested action, but Chestang was never disciplined. Dylon Rivers (race unspecified) and Sammy Marks (white) "also used the 'N' word in the presence of managers with no penalty."

- When Stewart decided to step down as manager, her pay was "cut immediately. However, white manager Victoria S was permitted to step down as manager but retained her manager's salary until she ultimately left the company."

- "[R]acial joking would occur on the job, and management would often participate in this activity." Cauley "once asked [Stewart] why black people prefer grape jelly and white people like strawberry. This happened on more than one occasion, and with different managers." Cauley and "Miles had asked why black people like hot fries, and then they would start laughing. White manager Erin sent a cartoon to all other managers about a black person refilling their cup with soda when the cup was requested for water. When [Stewart] responded online that the cartoon offended [her], Erin responded that 'it is a white guy holding the cup' and it was sent in 'fun' not to be hurtful . . . [Cauley], who was also copied on the cartoon mail, said the cartoon had nothing to do with the job, and took no action against Erin for posting the racist cartoon, saying it was her personal face-book page."

(Doc. 45).

First, some of the above-cited portions of Stewart's declaration simply present more weak and dissimilar comparator evidence. The only incident of insubordination not resulting in termination that Stewart recounts is her own; as she is the same race as Knight, it is not evidence

racial discrimination. Also, while Knight has pointed to a significant amount of evidence indicating discriminatory hiring and promotional practices by FDE at the Citronelle McDonald's, any such practice is not relevant to Knight's termination claim - the undisputed evidence indicates that she was hired to work at the Citronelle McDonald's, and she has made no claim that she was discriminatorily denied a promotion. See Holifield, 115 F.3d at 1563 (generalized incidents of discrimination not concerning the plaintiff do not support an allegation of disparate treatment).

Also, many of Stewart's allegations simply refer to management, which is unhelpful to the Court's ability to analyze the evidence in a light favorable to Knight. This is because the alleged " 'biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case.' " Id. at 1563-64 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 10 (1st Cir. 1990)).

What is significant is evidence of Cauley's alleged participation in what Knight termed as "racial joking" and her alleged toleration of inappropriate racial comments by customers and employees. Because this is not a hostile work environment case, the only import of this evidence is to show that Cauley has racist tendencies that infected and tainted her decision to terminate Knight, i.e., that Knight's termination was motivated by racial discrimination. Thus, the question is whether the evidence could sustain such a finding by a jury. To be sure, the evidence that is attributable to Cauley, the only identified decision maker in Knight's termination, is as follows:

- Cauley allowed a customer who had made a racist comment to be served.

- Cauley asked why black people prefer grape jelly and white people like strawberry jelly.

- Cauley asked why black people like hot fries and started laughing.

- Cauley heard an employee use a racial slur on the job and did not take action against the employee.

- Cauley was copied on a racist cartoon that an employee had posted on the employee's Facebook page and took no action against the employee.

While such evidence would lend support to a claim of a racially hostile work environment, it fails to "present[] a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by [Cauley]." Smith, 644 F.3d at 1328 (alterations added) (quotation omitted). As Smith explained, "no matter its form, circumstantial evidence [must ]raise[] a reasonable inference that the employer discriminated against *the plaintiff*." Id. (emphasis added).[18] It would not be reasonable to infer from Cauley's alleged behavior that she chose to fire Knight because of Knight's race, especially in light of Knight's admitted misbehavior and her dismal employment record while at the Citronelle McDonald's.

"[I]n a disparate treatment case, the plaintiff bears the ultimate burden of proving that the employment action at issue was taken because of the plaintiff's [protected characteristic]." EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1273-74 (11th Cir. 2000). Put simply, Knight has failed to satisfy this burden by producing sufficient evidence indicating that her termination was due to her race. Thus, the Court finds that FDE's motion for summary judgment is due to be **GRANTED** as to Knight's race discrimination claims (Count I of the Complaint).

### c. Abandoned Claims

FDE's motion requests summary judgment on, and presents evidence and argument regarding, all of Knight's claims. In its Reply, FDE correctly points out that Knight's Response

---

[18] Knight further weakens her case by failing to explain the significance of the majority of these incidents, instead simply copy-pasting portions of Stewart's declaration into her brief and expecting the Court to figure it out. Cf. Davis v. Dunn Const. Co., Inc., 872 F. Supp. 2d 1291, 1318-19 (N.D. Ala. 2012) ("It would be unproductive and unnecessary for the court to parse through Plaintiff's evidence to explain why each specific piece of evidence concerning Blue, Maddox, Coleman, Taylor, and Dixon is not relevant to Plaintiff's case, particularly since Plaintiff has not bothered to explain why he believes this evidence is relevant. See Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ('[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment').").

"focuses exclusively on her claim of race discrimination" and "does not present any evidence or argument regarding her claims of age discrimination or retaliation . . ." (Doc. 48 at 2). As such, the Court finds that Knight has abandoned her ADEA and retaliation claims (Counts II & III of the Complaint). See Clark v. City of Atlanta, Ga., No. 12-14392, 2013 WL 6037179, at *5 (11th Cir. Nov. 15, 2013) (unpublished) (" 'In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him.' " Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir.1995) (citation and internal quotation marks omitted). As such, '[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.' Id. (citation omitted). Instead, 'the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.' Id. (citations omitted). The district court, therefore, properly treated as abandoned the Clarks' excessive force and state law claims, which were alleged in the complaint, but not addressed in opposition to the motion for summary judgment."); Giles v. Daytona State Coll., Inc., 13-11081, 2013 WL 5764659 (11th Cir. Oct. 25, 2013) ("Although Giles argues her failure to produce a comparator does not doom her case, . . . this argument fails under the circumstances of her specific case. She points to her receipt of the Jackson article and statements from current and former employees that her treatment was 'racial,' but she did not raise these arguments before the district court in summary judgment, and thus, she has abandoned them. Solutia, Inc. v. McWane, Inc., 672 F.3d 1230, 1239 (11th Cir.), cert. denied, —— U.S. ——, 133 S. Ct. 427, 184 L. Ed. 2d 258 (2012)."); Ekokotu v. Fed. Exp. Corp., 523 F. App'x 629, 632 (11th Cir. 2013) ("[T]he court correctly held that Ekokotu abandoned the claims because he not only failed to argue them in response to FedEx's motion for summary judgment, but he explicitly and unequivocally disavowed them in response to FedEx's motion for summary judgment." (citing Resolution Trust Corp., 43 F.3d at 592); Fischer v. Fed. Bureau of Prisons, 349 F. App'x 372, 375

n.2 (11th Cir. 2009) ("Fischer has waived any claim related to the blood clotting in his leg because he did not address that issue in response to Dr. Tidwell's motion for summary judgment." (citing Transamerica Leasing, Inc. v. Inst. of London Underwriters, 267 F.3d 1303, 1308 n.1 (11th Cir. 2001)); Crayton v. Valued Servs. of Ala., LLC, 737 F. Supp. 2d 1320, 1331 (M.D. Ala. 2010) (". . . [T]he Court finds that Plaintiff has abandoned her non-termination retaliation claims due to her failure to address Defendant's arguments respecting these claims or otherwise provide support for them in her response to the motion for summary judgment." (citing cases)); Daniels v. City of Hartford, Ala., 645 F. Supp. 2d 1036, 1049 (M.D. Ala. 2009) ("To the extent there were claims against Sheriff Olsen in his official capacity asserted in the Amended Complaint that Plaintiffs have not explicitly abandoned, Plaintiffs have abandoned them because the response to the Motion for Summary Judgment failed to address these claims."); Johnson-Mosley v. Ala. Unified Judicial Sys., Civ. A. No. 12-0184-CG-N, 2013 WL 1966009, at *4 (S.D. Ala. May 9, 2013) (Granade, J.).[19]

Even if Knight's age discrimination and retaliation claims should not be considered abandoned, summary judgment as to FDE on these claims would still be appropriate. Her age discrimination claim fails for the same reasons the Court has found that her racial discrimination

---

[19] Though Knight references her age discrimination and retaliation claims in the opening/ overview" of her response (Doc. 44 at 1), no substantive argument regarding these claims is presented in the rest of the response. Such passing reference is insufficient to preserve those issues. See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681-82 (11th Cir. 2014) ("Abandonment of a claim or issue can . . . occur when the passing references to it are made in the 'statement of the case' or 'summary of the argument,' as occurred here. See Cole[ v. U.S. Att'y Gen.], 712 F.3d [517,] 530[ (11th Cir. 2013)] (holding that a party abandons an issue when he 'mentions [it] only in his Statement of the Case but does not elaborate further in the Argument section'); Kelliher v. Veneman, 313 F.3d 1270, 1274 n.3 (11th Cir. 2002) (holding that mentioning a claim in the summary of the argument section is not enough to raise the issue for appeal and that the claim is deemed abandoned).") (discussing abandonment of issue on appeal) (footnote omitted); EEOC v. Summer Classics, Inc., 471 F. App'x 868, 870 (11th Cir. 2012) ("A 'mere recitation of the underlying facts [in a brief to the district court] ... is insufficient to preserve an argument; the argument itself must have been made below.' Ledford[ v. Peeples], 657 F.3d [1222,] 1258[ (11th Cir. 2011)] . . . We . . . find that the EEOC waived its argument that March 23, 2007 is the correct date. The EEOC's factual objections, without corresponding legal argument, were insufficient to preserve the argument on appeal.")

claims should fail.[20]  Knight has also failed to carry her burden of establishing a *prima facie* case of retaliation.   Under both Title VII and § 1981, "[a] plaintiff establishes a prima facie case of retaliation by showing that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action."  Chapter 7 Tr., 683 F.3d at 1258 (quotations omitted).  Knight has failed, *inter alia*, to identify any "statutorily protected expression" for which FDE allegedly retaliated against her.

Thus, the Court finds that FDE's motion for summary judgment is due to be **GRANTED** as to Knight's age discrimination and retaliation claims (Counts II and III of the Complaint).

### V.      Conclusion

In accordance with the foregoing analysis, it is **ORDERED** that FDE's Motion for Summary Judgment (Doc. 36) is **GRANTED** and that all of Knight's claims in this action are **DISMISSED with prejudice**.  Thus, the final pretrial conference and all other pending deadlines in this action are **CANCELLED.**

Final judgment in accordance with this Order and Federal Rule of Civil Procedure 58 shall be entered contemporaneously by separate document.

**DONE** and **ORDERED** this the **3rd** day of **February 2014.**

/s/  Kristi K. DuBose_____
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

[20]  " '[T]he ADEA makes it "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." ' Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*) (quoting 29 U.S.C. § 623(a)(1)).  The elements to establish an employment discrimination claim under § 1981 and the ADEA are the same as those required under Title VII.  Howard v. BP Oil Co., 32 F.3d 520, 524 n.2 (11th Cir. 1994) (Section 1981 claims); Chapman, 229 F.3d at 1024 (ADEA claims)."  Porter v. Am. Cast Iron Pipe Co., 427 F. App'x 734, 736 (11th Cir. 2011) (alteration added).